UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHARLES PLACE ASSOCIATES

v. C.A. No. CA 07 368

CARRIER CORPORATION, individually and doing business as "CARRIER COMMERCIAL SERVICE, a Division of Carrier Corporation"

**VERIFIED COMPLAINT**

Parties and their Citizenship

1. Plaintiff, Charles Place Associates ("the Partnership"), is a Limited Partnership, existing under and by virtue of the laws of the State of Rhode Island.

2. The Partnership owns and its principal place of business is situated upon certain real property (together with all buildings and improvements thereon) located at 460 Charles Street, Providence, Rhode Island ("Charles Place").

3. The Partnership was created on or about August 31, 1972, and since that time has continuously existed and has been and is a citizen of the State of Rhode Island.

4. Upon information and belief, defendant, Carrier Corporation ("Carrier") is, and at all times mentioned was, a corporation duly organized and existing under the laws of the State of Delaware with its principal office and place of business at One Carrier Place, Farmington, Connecticut, and also transacts business under the name "Carrier Commercial Service, a Division of Carrier Corporation".

5. Upon information and belief, Carrier was first registered and/or qualified to transact business as a foreign corporation in the State of Rhode Island on or about February 25, 1981, has not registered or qualified the name or entity "Carrier Commercial Service" in Rhode Island and has never been and is not a citizen of the State of Rhode Island.

6. Upon information and belief, Carrier is a citizen of either Delaware or Connecticut.

## Jurisdiction and Venue

7. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that this is a civil action wherein the matter in controversy exceeds the value of $75,000 (exclusive of interest and costs) and is between citizens of different states. In furtherance of that jurisdiction, this Court may also allow Declaratory relief pursuant to 28 U.S.C. §2201.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), since the events giving rise to the Partnership's claims occurred and the location of the Charles Place premises (described above) are within this judicial district.

## Factual Background

9. Immediately following its creation in 1972, the Partnership entered into mortgage financing agreements with the United States Department of Housing and Urban Development ("HUD") for the financing of Charles Place.

10. The aforementioned mortgage financing agreements were issued pursuant to the provisions of the Section 236 Loan Program of the Housing and Urban Development Act of 1968, Pub. L. No. 90-448 § 201(a), 236 (a) - (g), 82 Stat. 476, 498 [codified, as amended, at 12 U.S.C. 1715 z-1 (2000)].

11. HUD and the Partnership have also entered into a series of so-called Section 8 contracts at or for the tenants of Charles Place.

12. From 1973 through the date of this Complaint, the Partnership has operated Charles Place under the previously-referenced federal subsidized housing programs, leasing their units to individuals qualified thereunder (including elderly persons and persons having various handicaps) at or for rental sums well below market rates in the Providence County, Rhode Island, area.

13. From the beginning of its existence and for many years thereafter, Charles Place received its electrical power from commercial power grid sources (for most of that time, the Narragansett Electric Company).

14. Acting through representatives named Michael A. Guyder and Robert S. Fitzpatrick, Carrier proposed that Charles Place consider purchasing a "Combined Power, Heat and Chilled Water System" with auxiliary equipment (Carrier's design and equipment does not comprise the entire system, but will nevertheless be hereinafter referred to as either "the cogeneration system" or by the shorthand expression "the system") that would, they stated, significantly reduce the Partnership's costs and provide continuous electrical power, heat and cooling essential to the daily operation of Charles Place.

15. During the course of ensuing discussions, Carrier's representatives were clearly and unequivocally advised of the fact that Charles Place was a HUD-financed project and of the number and types of tenants residing at the premises.

16. As a result of these discussions and in furtherance of exploring all possibilities relating to the installation of the proposed cogeneration system, the Partnership contacted Narragansett Electric and was advised that if the cogeneration system were installed and Charles Place remained connected to the electric "grid" on even a "standby basis" the cost would be more than $75,000 per year (an entirely unrealistic demand and amount).

17. In further discussions with Carrier's representatives, the Partnership was advised that staying connected to the "grid" would be unnecessary because Carrier would provide and install the cogeneration system and that this would allow Charles Place to become an "island", generating its own power, heat and air conditioning fully independent of the commercial power "grid".

18. Carrier's representatives proclaimed that its cogeneration power system was something that could "run continuously and uninterrupted" and that the system would never have to be shut down since its component units could be taken offline (be disconnected) one at a time for any necessary maintenance, thus power to Charles Place would never have to be lost or shut off.

19. Out of an abundance of caution, the Partnership decided not only to purchase the cogeneration system as Carrier had suggested but to purchase two additional cogeneration units at Carrier's further recommendation so that there would be absolutely no need (based on Carrier's representations) to have an "emergency" generator or a "backup" connection to the commercial power "grid".

20. On or about July 12, 2005, Carrier submitted its quotation for materials and services for the cogeneration system in the sum of *one million nine hundred fifty-eight thousand ($1,958,0000.00) dollars.*

21. Since HUD financing was involved in the project, the aforementioned Carrier representations were presented to HUD and met with its approval.

22. Since the cogeneration system allowed and/or necessitated other improvements at Charles Place, third party electrical subcontractors hired specifically for work associated with the cogeneration project were present and also witnessed Carrier's aforementioned representations.

22. Following construction and just before the cogeneration system was first placed "online", Carrier's engineers expressed concern that the system might not be large enough (have the capacity) to supply Charles Place, despite the fact that the system was being implemented solely for use at Charles Place.

23. When the cogeneration system was first placed "online", it was discovered for the first time that it had actually been *overdesigned* (at unnecessary expense) by Carrier and could have easily supplied an even larger building.

24. The Partnership relied solely on Carrier for the design and installation of the cogeneration system.

25. When the cogeneration system was placed into operation it did not perform as promised and the Partnership was advised that a gas furnace intended to supplement the water from the system's generators was not functioning. Therefore, the Partnership had to place its old, inefficient electric hot water heater into use to supply hot water in sufficient quantity to its tenants at Charles Place, all at added expense that should have been unnecessary based upon Carrier's representations.

26. Neither the Partnership nor anyone acting on its behalf has ever modified, changed or participated in the modification or change of any component of the cogeneration system nor have they ever configured, installed or participated in the configuration or installation of any component of the cogeneration system.

27. Following installation and the initialization of the cogeneration system, pumps or other components of the system have overheated on several occasions, requiring shut down and/or maintenance and in an effort to remedy these conditions (designed by Carrier), the Partnership has at its expense installed an exhaust fan and air conditioning units that should have been part of the original design.

28. About two months before the filing of this complaint, power to the entire Charles Place Building was suddenly and unexpectedly lost for several hours, causing the Providence Fire Department to respond and resulting in numerous staff and tenant complaints. Upon information and belief, Carrier seeks to charge the Partnership approximately $35,000 for having restarted the cogeneration system on that occasion and for trying to determine what problem caused this failure.

29. During the summer of 2007, Carrier's maintenance personnel shut the entire system down and advised the Partnership for the first time that the cogeneration system was designed with a generator with a "master control" which, if taken out of service, causes the entire system to shut down or to fail.

30. The generator with a master control design does not allow the cogeneration system to operate in the manner that was represented to the Partnership and a Carrier representative has advised that the system cannot be rewired to include an alternative design or relay to correct this master control condition.

31. On or about July 20, 2007, the Carrier representatives identified in paragraph fourteen (14), above, wrote to a representative of the Partnership, advising for the first time that periodic maintenance shutdowns for approximately four (4) hours' duration were necessary for this cogeneration system. In their letter they indicated that Carrier would "coordinate these shutdowns with your staff to minimize tenant disruptions".

32. The facility that supplies Charles Place is equipped with a connection for an emergency generator that would, if utilized, allow emergency systems (but not all systems) in the building to function, but Carrier has failed or refused to deploy a generator during any unexpected or planned "outages".

33. On Thursday, September 27, 2007, Carrier's representatives advised the Partnership that they needed to take the cogeneration system out of operation for about 15 to 30 minutes but would have no emergency generator in place.

34. The September 27, 2007 work took much longer and the Partnership has been advised that additional work is required, but during the Thursday efforts one tenant suffered what is reportedly a stroke while the power was out.

35. The Partnership requires a continuous supply of electricity and power for the operation of Charles Place and so advised Carrier in the design phase and would not have procured this system if it could not perform in that fashion.

36. At all times mentioned, the Partnership has duly performed, and still performs, any and all conditions precedent on its part to be performed in connection with receiving from Carrier a continuous supply of electricity and power, at all times mentioned was entitled to receive from Carrier such supply of electricity and power, and relied upon Carrier to continue to furnish such service in accordance with its promises and representations.

37. Upon information and belief, despite having been notified of and aware of the foregoing, Carrier has failed or refused to either deploy an emergency generator at their expense to avoid the impact (and potential impact) of loss of the cogeneration system from time to time.

38. All preceding paragraphs of this complaint are restated and incorporated, by reference, in each count that follows.

COUNT ONE

(Specific Performance)

39. Carrier's actions have breached its contract with the Partnership.

40. Under the circumstances, the Partnership is entitled to Specific Performance by Carrier of its portion of the contract; namely, the proper design of the cogeneration system and its configuration and installation of a system that will meet all representations described above.

41. The Partnership is entitled to specific performance of the contract at the sole cost and expense of Carrier.

42. Throughout the time required for Carrier to complete specific performance, Carrier should be accountable and responsible for making alternative arrangements to supply continuous electricity and power to the Charles Place premises at its sole expense.

COUNT TWO

(Breach of Express Warranty)

43. The cogeneration system constituted and constitutes "goods" as defined by the version of the Uniform Commercial Code enacted and existing at all relevant times in the State

of Rhode Island; specifically, the system is encompassed within the definitions found at section 6A-2-105 of the General Laws of Rhode Island, 1956, as amended ("R.I.G.L.")

44. The aforementioned statements made by Carrier's representatives became a material basis of the bargain and created an express warranty that the cogeneration system would conform to such affirmation or promise pursuant to R.I.G.L. section 6A-2-313.

45. Carrier furnished no written document that purported to limit, exclude or modify any warranty or warranties made to the Partnership.

46. No subsequent course of dealing or conduct has limited, excluded or modified any warranty or warranties made by Carrier to the Partnership.

47. Under the circumstances, Carrier has breached its express warranty or warranties to the Partnership, resulting in added expense and damages to the Partnership as described above. Furthermore, it should be responsible to HUD, to all employees, staff, tenants and/or visitors at or to Charles Place for any damages that they may incur as they are among those persons who may reasonably be expected to be affected by the goods and breach of warranty pursuant to R.I.G.L. section 6A-2-318.

## COUNT THREE

(Breach of Implied Warranty)

48. The cogeneration system constituted and constitutes "goods" as defined by the version of the Uniform Commercial Code enacted and existing at all relevant times in the State of Rhode Island; specifically, the system is encompassed within the definitions found at section 6A-2-105 of the General Laws of Rhode Island, 1956, as amended ("R.I.G.L.")

49. The aforementioned statements made by Carrier's representatives were made at a time when Carrier had reason to know the exact and particular purpose for which the cogeneration system was sought by the Partnership, knew that the Partnership was relying on its skill or judgment to select or furnish suitable goods, became a material basis of the bargain and created an implied warranty that the cogeneration system would be reasonably fit for the Partnership's purposes pursuant to R.I.G.L. section 6A-2-315.

50. Carrier furnished no written document that purported to limit, exclude or modify any warranty or warranties made to the Partnership.

51. No subsequent course of dealing or conduct has limited, excluded or modified any warranty or warranties made by Carrier to the Partnership.

52. Under the circumstances, Carrier has breached its implied warranty or warranties of fitness for an intended purpose to the Partnership, resulting in added expense and damages to the Partnership as described above. Furthermore, it should be responsible to HUD, to all employees, staff, tenants and/or visitors at or to Charles Place for any damages that they may incur as they are among those persons who may reasonably be expected to be affected by the goods and breach of warranty pursuant to R.I.G.L. section 6A-2-318.

## COUNT FOUR

(Negligence)

53. Carrier's actions have been negligent, careless and lacked reasonable care toward the Partnership.

54. The negligence, carelessness, and lack of reasonable care on the part of Carrier consisted of the following (and perhaps other things not currently known to the Partnership):

a. Failure to furnish and provide cogeneration system instrumentalities and facilities that were safe and adequate and in all respects just and reasonable;

b. Failed to maintain adequate and reasonable equipment, including equipment to produce and furnish to plaintiff emergency supplies of electricity and power for reasonably foreseeable situations, failure to furnish sufficient electricity to meet the needs and demands of the Partnership, to whom Carrier was obligated to furnish adequate electrical service and power;

c. Arbitrarily and unreasonably discontinuing, disconnecting, and interrupting electrical service and power to Charles Place without first taking other action that might have prevented such interruption;

d. Arbitrarily and unreasonably discontinuing, disconnecting, and interrupting Carrier's supply of electricity and power to Charles Place without first giving notice or warning to the Partnership of such intended action or the frequency and duration of such intended action by Carrier;

e. Failing to properly design the cogeneration system for all of its intended purposes and/or in accordance with the representations that induced the Partnership to purchase the system; and

f. Allowing its interruptions of the Partnership's electrical service and power to continue for unreasonable lengths of time without due cause or justification.

55. As a direct and proximate result of Carrier's above-described negligence and carelessness, the Partnership sustained damages and will continue to suffer damages in the nature of increased expenses as described herein.

## COUNT FIVE

(Promissory or Equitable Estoppel)

56. At no time prior to the summer of 2007 did Carrier or any of its representatives advise the Partnership that Carrier's representations and/or promises concerning how its cogeneration system would allow Charles Place to operate as an "island" and/or "continuously" might or would not be kept or should or must be disregarded.

57. Throughout the times described in this complaint, Carrier benefited and profited from the more than two million ($2,000,000.00) dollars it has been paid by the Partnership (with HUD financing).

58. Based upon the factual situation described above, the Partnership justifiably and detrimentally relied on Carrier's promises, the actions that seemed to support those promises and the representations of its agents and Carrier knew or should have known that its statements and actions would induce such reliance by the Partnership.

59. The actions and representations of Carrier are such as to estop it from avoiding liability to the Partnership.

60. Carrier's failure to keep its promises to the Partnership have been detrimental to the Partnership, causing it the loss of the benefit of its bargain or contract with Carrier as well as other damages related to the cogeneration system and its failure to function as promised.

61. The Partnership is accordingly entitled to all compensatory damages proximately resulting from the breach of promises described herein, based upon promissory and/or equitable estoppel.

COUNT SIX

(Common Law Fraud)

62. Upon information and belief, the actions and representations of Carrier and its representative, both before, during and after design and installation of the cogeneration system were intentionally designed and contrived to deceive the Partnership and obtain money (payment) for a system that did not and could not comport with such representations under false pretenses.

63. The actions and representations of Carrier and its representatives, as described herein, amount to common law fraud and were undertaken in a manner that entitles the Partnership to both compensatory and exemplary damages.

## REQUESTS FOR RELIEF

WHEREFORE, the Partnership respectfully prays that this Court:

A. Construe the facts, agreements, contract documents and all the terms and provisions of the same;

B. Declare that the statements of Carrier's representatives have created express and implied warranties of fitness for a particular purpose that have never been modified, limited or revoked;

C. Declare that Carrier has breached its contract, its express warranties and its implied warranties.

D. Direct that Carrier be required to redesign and reconfigure the cogeneration system so as to specifically perform its part of the contract at Carrier's sole expense and within a reasonable period of time.

E. Direct that during all times that Carrier performs work upon and/or redesigns or reinstalls the cogeneration system it will provide or arrange for provision of electricity and power to the Charles Place premises and pay all added costs and expenses necessary to do so.

F. Grant the Partnership all of its damages and expenses, including compensatory and exemplary or punitive damages.

G. Construe the law and matters in question and determine the rights and obligations of the parties under these circumstances.

H. Make such further orders as are appropriate in the circumstances, to the end that all parties have clear notice and understanding of the decision and directives of this court.

I. Pursuant to 28 U.S.C.§ 2202, grant the Partnership such further relief as may be fitting, just and appropriate in the circumstances, including but not limited to an award of reasonable attorney fees and costs.

J. Grant the Partnership a trial, by jury, on all issues and matters so triable.

CHARLES PLACE ASSOCIATES
By Its Attorney,

John B. Reilly (#1811)
JOHN REILLY & ASSOCIATES
100 North Main Street, 4th Floor
Providence, R.I. 02903
(401) 272-2800
(Fax) 272-2811

VERIFICATION

The undersigned, being duly sworn upon oath, hereby depose and say that:

1. I am the General Partner and duly authorized representative of the plaintiff in this action.

2. I hereby verify that the facts and matters contained in the foregoing complaint are, to the best of my personal knowledge and belief, true and accurate.

3. With respect to those matters that are asserted to be "upon information and belief", I further, to the best of my knowledge, believe them to be as stated.

H. Charles Tapalian, General Partner

Subscribed and sworn before me at Providence, this 3rd day of October, 2007.

Notary Public