UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHARLES PLACE ASSOCIATES

v. C.A. No. 07-368 S

CARRIER CORPORATION, individually and doing business as "CARRIER COMMERCIAL SERVICE, a Division of Carrier Corporation" and UNITED TECHNOLOGIES COMPANY, individually and doing business As "UTC Power, A United Technologies Company"

# AMENDED VERIFIED COMPLAINT

## Parties and their Citizenship

1. Plaintiff, Charles Place Associates ("the Partnership"), is a Limited Partnership, existing under and by virtue of the laws of the State of Rhode Island.

2. The Partnership owns and its principal place of business is situated upon certain real property (together with all buildings and improvements thereon) located at 460 Charles Street, Providence, Rhode Island ("Charles Place").

3. The Partnership was created on or about August 31, 1972, and since that time has continuously existed and has been and is a citizen of the State of Rhode Island.

4. Upon information and belief, defendant, Carrier Corporation ("Carrier") is, and at all times mentioned was, a corporation duly organized and existing under the laws of the State of Delaware with its principal office and place of business at One Carrier Place, Farmington,

Connecticut, and also transacts business under the name "Carrier Commercial Service, a Division of Carrier Corporation".

5. Upon information and belief, Carrier was first registered and/or qualified to transact business as a foreign corporation in the State of Rhode Island on or about February 25, 1981, has not registered or qualified the name or entity "Carrier Commercial Service" in Rhode Island and has never been and is not a citizen of the State of Rhode Island.

6. Upon information and belief, Carrier is a citizen of either Delaware or Connecticut.

7. Upon information and belief, defendant, United Technologies Company ("UTC") is, and at all times mentioned herein was, a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business at Connecticut and transacts business under the name of or through a subsidiary known as "UTC Power".

Jurisdiction and Venue

8. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that this is a civil action wherein the matter in controversy exceeds the value of $75,000 (exclusive of interest and costs) and is between citizens of different states. In furtherance of that jurisdiction, this Court may also allow Declaratory relief pursuant to 28 U.S.C. §2201.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), since the events giving rise to the Partnership's claims occurred and the location of the Charles Place premises (described above) are within this judicial district.

## Revised Factual Background

10. Immediately following its creation in 1972, the Partnership entered into mortgage financing agreements with the United States Department of Housing and Urban Development ("HUD") for the financing of Charles Place.

11. The aforementioned mortgage financing agreements were issued pursuant to the provisions of the Section 236 Loan Program of the Housing and Urban Development Act of 1968, Pub. L. No. 90-448 § 201(a), 236 (a) - (g), 82 Stat. 476, 498 [codified, as amended, at 12 U.S.C. 1715 z-1 (2000)].

12. HUD and the Partnership have also entered into a series of so-called Section 8 contracts at or for the tenants of Charles Place.

13. From 1973 through the date of this Complaint, the Partnership has operated Charles Place under the previously-referenced federal subsidized housing programs, leasing their units to individuals qualified thereunder (including elderly persons and persons having various handicaps) at or for rental sums well below market rates in the Providence County, Rhode Island, area.

14. From the beginning of its existence and for many years thereafter, Charles Place received its electrical power from commercial power grid sources (for most of that time, the Narragansett Electric Company, and, more recently, "The National Grid") (hereinafter individually and collectively referred to by the shorthand expression or tem, "the Grid").

15. Acting through representatives named Michael A. Guyder and Robert S. Fitzpatrick, Carrier proposed that Charles Place consider purchasing a "Combined Power, Heat and Chilled Water System" with auxiliary equipment (Carrier's design and equipment does not

comprise the entire system, but will nevertheless be hereinafter referred to as either "the cogeneration system" or by the shorthand expression "the system") that would, they stated, significantly reduce the Partnership's costs and provide continuous electrical power, heat and cooling essential to the daily operation of Charles Place.

16. During the course of ensuing discussions, Carrier's representatives were clearly and unequivocally advised of the fact that Charles Place was a HUD-financed project and of the number and types of tenants residing at the premises.

17. As a result of these discussions and in furtherance of exploring all possibilities relating to the installation of the proposed cogeneration system, the Partnership contacted the Grid and was advised that if the cogeneration system were installed and Charles Place remained connected parallel to the electric "grid" (as proposed by Carrier) on even a "standby basis" the cost would be more than $75,000 per year (an entirely unrealistic demand and amount).

18. In further discussions with Carrier's representatives, the Partnership was advised that staying connected parallel to the "grid" would be unnecessary (as originally proposed by Carrier) because Carrier would provide and install the cogeneration system in a manner that would allow Charles Place to become an "island", generating its own power, heat and air conditioning fully independent of the commercial power "grid".

19. Carrier's representatives proclaimed that its cogeneration power system was something that could "run continuously and uninterrupted" and that the system would never have to be shut down since its component units could be taken offline (be disconnected) one at a time for any necessary maintenance, thus cogeneration power to Charles Place would never have to be lost or shut off.

20. Out of an abundance of caution, the Partnership decided not only to purchase the cogeneration system package that Carrier had suggested but to purchase two additional cogeneration units (micro turbines manufactured by Capstone) at Carrier's further recommendation so that there would be absolutely no need (based on Carrier's representations) to have an "emergency" generator or a "backup" connection to the commercial power "grid".

21. On or about July 12, 2005, Carrier submitted its quotation or proposal for materials and services for the cogeneration system in the sum of *one million nine hundred fifty-eight thousand ($1,958,0000.00) dollars.*

22. At the time that Carrier submitted its aforementioned proposal, it specified a package of "hardware", including micro turbines and associated components manufactured and/or to be supplied by Capstone.

23. At the time that Carrier submitted its aforementioned proposal, plaintiff was aware that Carrier was a subsidiary of UTC, but was unaware that UTC and Capstone were planning or had concluded a "strategic partnership" by and through which such companies (among other things) promoted the sale and use of Capstone equipment on cogeneration projects such as the project involving the Partnership.

24. Upon information and belief, during this process the Rhode Island Public Utilities Commission required the Grid to offer much better "standby" fees than had been originally proposed, thus the Partnership advised Carrier that it wanted to remain an "island" but to do so in parallel connection with the Grid.

25. Carrier advised that this was entirely feasible and thus original plans accompanying or shortly following the previously described proposal the initial plans for the

project depicted an interconnection device that later became known as a dual mode controller ("DMC").

26. Since HUD financing was involved in the project, the aforementioned Carrier representations and proposal were presented to HUD and met with its approval.

27. Since the cogeneration system allowed and/or necessitated other improvements at Charles Place, third party electrical subcontractors and a professional engineer hired specifically for work associated with the cogeneration project were present and also witnessed Carrier's aforementioned representations.

28. Carrier was also advised and aware of the fact that the Partnership was utilizing the Naples Holding Corp. ("Naples") as a general contractor for the project at Charles Place and Naples at all times acted as the agent of a disclosed principal (the Partnership) upon whose property and for whose use the project was taking place.

29. Following construction and just before the cogeneration system was first placed "online", Carrier's engineers expressed concern that the system might not be large enough (have the capacity) to supply Charles Place, despite the fact that the system was in excess of the original package and proposal made to the Partnership and that it was being implemented solely for use at Charles Place.

30. When the cogeneration system was first placed "online", it was discovered for the first time that it had actually been *overdesigned* (at *unnecessary expense to the Partnership*) by Carrier and could have easily supplied an even larger building.

31. The Partnership and its agents relied solely on Carrier for the specifications, design and installation of the cogeneration system.

32. When the cogeneration system was placed into operation it did not perform as promised and the Partnership was advised that a gas furnace intended to supplement the water from the system's generators was not functioning. Therefore, the Partnership had to place its old, inefficient electric hot water heater into use to supply hot water in sufficient quantity to its tenants at Charles Place, all at added expense that should have been unnecessary based upon Carrier's representations.

33. Neither the Partnership nor anyone acting on its behalf has ever modified, changed or participated in the modification or change of any component of the cogeneration system nor have they ever configured, installed or participated in the configuration or installation of any component of the cogeneration system.

34. Following installation and the initialization of the cogeneration system, pumps or other components of the system have overheated on several occasions, requiring shut down and/or maintenance and in an effort to remedy these conditions (designed by Carrier), the Partnership has at its expense installed an exhaust fan and air conditioning units that should have been part of the original design.

35. About two months before the filing of its original complaint, power to the entire Charles Place Building was suddenly and unexpectedly lost for several hours, causing the Providence Fire Department to respond and resulting in numerous staff and tenant complaints. Upon information and belief, Carrier seeks to charge the Partnership approximately $35,000 for having restarted the cogeneration system on that occasion and for trying to determine what problem caused this failure.

36. During the summer of 2007, Carrier's maintenance personnel shut the entire system down and advised the Partnership for the first time that the cogeneration system was designed

with a generator with a "master control" which, if taken out of service, causes the entire system to shut down or to fail.

37. The generator with a master control design does not allow the cogeneration system to operate in the manner that was represented to the Partnership and a Carrier representative has advised that the system cannot be rewired to include an alternative design or relay to correct this master control condition.

38. On or about July 20, 2007, the Carrier representatives identified in paragraph fourteen (14), above, wrote to a representative of the Partnership, advising for the first time that periodic maintenance shutdowns for approximately four (4) hours' duration were necessary for this cogeneration system. In their letter they indicated that Carrier would "coordinate these shutdowns with your staff to minimize tenant disruptions".

39. The facility that supplies Charles Place was (and is) equipped with a connection for an emergency generator that would (and does), if utilized, allow emergency systems (but not all systems) in the building to function, but Carrier has failed or refused until recently (January or February, 2008) to deploy a generator during any unexpected or planned "outages".

40. On Thursday, September 27, 2007, Carrier's representatives advised the Partnership that they needed to take the cogeneration system out of operation for about 15 to 30 minutes but would have no emergency generator in place.

41. The September 27, 2007 work took much longer and the Partnership has been advised that additional work is required, but during the Thursday efforts one tenant suffered what is reportedly a stroke while the power was out.

42. The Partnership requires a continuous supply of electricity and power for the operation of Charles Place and so advised Carrier in the design phase and would not have

procured this system if it could not perform in that fashion.

43. On or about October 2, 2007, one of the Partnership's agents, Multi-State Electric met with the aforementioned Mssrs. Guyder and Fitzpatrick and Rick Wallace ("Wallace") of UTC Power at the Charles Place premises to discuss the ongoing effort to reconnect the project to the Grid utilizing the methodology and designs originally proposed by Carrier.

44. Upon information and belief, Wallace conceded that the information provided by UTC and Carrier to that point in time was not complete and that Wallace would coordinate efforts to correct the DMC and its configuration with UTC Design. At the same meeting, Mr. Guyder indicated that UTC was preparing a schematic level drawing of the interconnect control system that would be completed and sent to the Grid within approximately two weeks.

45. A new schematic set of drawings was indeed completed on or about October 3, 2007 (the day after the site meeting described in the last two paragraphs), stamped "UTC Power -A United Technologies Company", titled "PureComfort Solution" and "Drawing No. APP67565" ("the UTC revision").

46. The UTC revision omitted the DMC interconnection and depicted an independent connection between the Grid and Charles Place – something not authorized, promised, nor envisioned by the Partnership at any time.

47. Carrier and/or UTC had been asked to answer certain proprietary and technical questions posed by the Grid concerning the so-called DMC, but nothing more; nevertheless, UTC and/or Carrier evidently recognized that they could not deliver the parallel connection system they originally promised and instead submitted the UTC revision to the Grid without the knowledge or approval of the Partnership or any agent acting on behalf of the Partnership.

48. In January, 2008, the Partnership learned for the first time that Carrier and/or UTC had taken the aforementioned unauthorized action with the Grid. At that time they also received copies of email communications between UTC, Carrier and the Grid that "(i)t has been noted that the Customer (Charles Place) has no intent to interconnect (parallel) generation with National Grid's Electric Power System (EPS)". It was at this same time that the Partnership's electrical consultant first received copies of the plans comprising the UTC revision.

49. Upon information and belief, subsequent investigation and research has indicated that Capstone has had several "silent recalls" of its micro turbines (including 6 at the Butler Hospital in about December, 2007) and that only DMC available may be insufficient to properly work with the loads generated at the Charles Place project but Carrier and UTC have failed or refused to alert the Partnership to these potential or actual issues.

50. Furthermore, it is clear that UTC and/or Carrier has supplied false documentation and made false and unauthorized representations to the Grid concerning the intent of the Partnership at a time or times when they were aware of the concerns and disputes raised by this Litigation, all the time protesting their willingness to negotiate but acting in a fashion reminiscent of the Japanese envoys talking peace while their aircraft carriers steamed toward Pearl Harbor.

51. At all times mentioned, the Partnership has duly performed, and still performs, any and all conditions precedent on its part to be performed in connection with receiving from Carrier a continuous supply of electricity and power in parallel connection with the Grid through an appropriate DMC, at all times mentioned was entitled to receive from Carrier such supply of electricity and power in accordance with the representations and plans that were furnished and

relied upon Carrier to continue to furnish such service in accordance with its promises and representations.

52. Upon information and belief, Carrier was aware that the Partnership relied upon its aforementioned representations but knew that such representations were false, misleading, deceitful and that it was unable to keep its promises to the Partnership, thus falsely and fraudulently induced the Partnership to enter into an agreement or agreements for products, services and excessive maintenance costs and have subsequently attempted (with the assistance and/or guidance of UTC) to "cover up" this deception, even after litigation between the parties had commenced.

53. Upon information and belief, the Partnership is currently unaware of the full extent of the deception and misrepresentations of Carrier and/or UTC, thus reserve the right to incorporate any additional factual findings and claims in this Amended Complaint and/or to seek to have the pleadings conformed to any such additional evidence as may hereafter appear.

54. Upon information and belief, despite having been notified of and aware of the foregoing, Carrier has failed or refused and/or delayed to either deploy an emergency generator at their expense to avoid the impact (and potential impact) of loss of the cogeneration system from time to time.

55. All preceding paragraphs of this complaint are restated and incorporated, by reference, in each count that follows.

COUNT ONE

(Rescission)

56. Carrier's actions have breached its contract(s) (and upon information and belief are evidence) with the Partnership and are evidence of the fact that it cannot deliver the system that it promised or do so in the way that it promised.

57. Under the circumstances, the Partnership is entitled to Rescission of the agreement(s) or the contract(s); namely, that Carrier will be compelled to return all funds paid for the system, remove the system from Charles Place, and pay for the engineering and installation of a replacement system that will meet all representations described above.

58. The partnership is also entitled to all energy costs it incurs during the time necessary to replace the Carrier/UTC system, including all costs associated with reconnecting Charles Place to the Grid.

59. Throughout the time required for Carrier to the foregoing corrective actions, Carrier should be accountable and responsible for making alternative arrangements to supply continuous electricity and power to the Charles Place premises at its sole expense.

COUNT TWO

(Breach of Express Warranty)

60. The cogeneration system constituted and constitutes "goods" as defined by the version of the Uniform Commercial Code enacted and existing at all relevant times in the State of Rhode Island; specifically, the system is encompassed within the definitions found at section 6A-2-105 of the General Laws of Rhode Island, 1956, as amended ("R.I.G.L.")

61. The aforementioned statements and representations made by Carrier and/or UTC representatives became a material basis of the bargain and created an express warranty that the

cogeneration system would conform to such affirmation or promise pursuant to R.I.G.L. section 6A-2-313.

62. Carrier furnished no written document that purported to limit, exclude or modify any warranty or warranties made to the Partnership, but even if it did any such document would be void in that any agreements were concluded only because of fraud and/or misrepresentation in their inducement.

63. No subsequent course of dealing or conduct has limited, excluded or modified any warranty or warranties made by Carrier to the Partnership.

64. Under the circumstances, Carrier and/or UTC have breached their express warranty or warranties to the Partnership, resulting in added expense and damages to the Partnership as described above. Furthermore, they should be responsible to HUD, to all employees, staff, tenants and/or visitors at or to Charles Place for any damages that they may incur as they are among those persons who may reasonably be expected to be affected by the goods and breach of warranty pursuant to R.I.G.L. section 6A-2-318.

<u>COUNT THREE</u>

(Breach of Implied Warranty)

65. The cogeneration system constituted and comprises "goods" as defined by the version of the Uniform Commercial Code enacted and existing at all relevant times in the State of Rhode Island; specifically, the system is encompassed within the definitions found at section 6A-2-105 of the General Laws of Rhode Island, 1956, as amended ("R.I.G.L.")

66. The aforementioned statements made by Carrier's representatives were made at a time when Carrier had reason to know the exact and particular purpose for which the cogeneration system was sought by the Partnership, knew that the Partnership was relying on its

skill or judgment to select or furnish suitable goods, became a material basis of the bargain and created an implied warranty that the cogeneration system would be reasonably fit for the Partnership's purposes pursuant to R.I.G.L. section 6A-2-315.

67. Carrier furnished no written document that purported to limit, exclude or modify any warranty or warranties made to the Partnership, but even if it did, any such document would be void in that any agreements were concluded because of fraud or misrepresentation in their inducement.

68. No subsequent course of dealing or conduct has limited, excluded or modified any warranty or warranties made by Carrier to the Partnership.

69. Under the circumstances, Carrier has breached its implied warranty or warranties of fitness for an intended purpose to the Partnership, resulting in added expense and damages to the Partnership as described above. Furthermore, it should be responsible to HUD, to all employees, staff, tenants and/or visitors at or to Charles Place for any damages that they may incur as they are among those persons who may reasonably be expected to be affected by the goods and breach of warranty pursuant to R.I.G.L. section 6A-2-318.

COUNT FOUR

(Negligence)

70. The actions of Carrier and UTC have been negligent, careless and lacked reasonable care toward the Partnership.

71. The negligence, carelessness, and lack of reasonable care on the part of defendants consisted of the following (and perhaps other things not currently known to the Partnership):

a. Failure to furnish and provide cogeneration system instrumentalities and facilities that were safe and adequate and in all respects just and reasonable;

b. Failed to maintain adequate and reasonable equipment, including equipment to produce and furnish to plaintiff emergency supplies of electricity and power for reasonably foreseeable situations, failure to furnish sufficient electricity to meet the needs and demands of the Partnership, to whom Carrier was obligated to furnish adequate electrical service and power;

c. Arbitrarily and unreasonably discontinuing, disconnecting, and interrupting electrical service and power to Charles Place without first taking other action that might have prevented such interruption;

d. Arbitrarily and unreasonably discontinuing, disconnecting, and interrupting Carrier's supply of electricity and power to Charles Place without first giving notice or warning to the Partnership of such intended action or the frequency and duration of such intended action by Carrier;

e. Failing to properly design the cogeneration system for all of its intended purposes and/or in accordance with the representations that induced the Partnership to purchase the system; and

f. Allowing its interruptions of the Partnership's electrical service and power to continue for unreasonable lengths of time without due cause or justification.

g. Failing to report to the Partnership and/or any representative of the Partnership that proposed changes in the DMC and parallel link plans were being given to the Grid.

h. Advising the Grid that the Partnership assented to changes in the DMC and parallel link plans without any reason to believe that this was an accurate statement of the Partnership's position.

72. As a direct and proximate result of Carrier's above-described negligence and carelessness, the Partnership sustained damages and will continue to suffer damages in the nature of increased expenses as described herein.

COUNT FIVE

(Promissory or Equitable Estoppel)

73. At no time prior to the summer of 2007 did Carrier, UTC or any of their representatives advise the Partnership that the representations and/or promises concerning how its cogeneration system would allow Charles Place to operate as an "island" and/or "continuously" might or would not be kept or should or must be disregarded.

74. At no time did carrier and/or UTC advise the Partnership that their representations that the DMC and parallel linkage to the Grid were inaccurate, false and could not be accomplished.

75. Throughout the times described in this complaint, Carrier and/or UTC benefited profited from the more than two million ($2,000,000.00) dollars it has been paid by the Partnership (with HUD financing).

76. Based upon the factual situation described above, the Partnership justifiably and detrimentally relied on the promises of Carrier and UTC, the actions that seemed to support those

promises and the representations of its agents and Carrier and UTC knew or should have known that their statements and actions would induce such reliance by the Partnership.

77. The actions and representations of Carrier and UTC are such as to stop it from avoiding liability to the Partnership.

78. The misrepresentations and failure of Carrier and UTC to keep its promises to the Partnership have been detrimental to the Partnership, causing it the loss of the benefit of its bargain or contract as well as other damages related to the cogeneration system and its failure to function as promised.

79. The Partnership is accordingly entitled to all compensatory damages proximately resulting from the breach of promises described herein, based upon promissory and/or equitable estoppel.

COUNT SIX

(Common Law Fraud)

80. Upon information and belief, the actions and representations of Carrier and UTC and their representatives, both before, during and after design and installation of the cogeneration system were intentionally designed and contrived to deceive the Partnership and obtain money (payment) for a system that did not and could not comport with such representations under false pretenses.

81. The actions and representations of Carrier and UTC and their representatives, as described herein, amount to common law fraud and were undertaken in a manner that entitles the Partnership to both compensatory and exemplary damages.

REQUESTS FOR RELIEF

WHEREFORE, the Partnership respectfully prays that this Court:

A. Construe the facts, agreements, contract documents and all the terms and provisions of the same;

B. Declare that the statements of Carrier and UTC and their representatives have created express and implied warranties of fitness for a particular purpose that have never been modified, limited or revoked;

C. Declare that Carrier and UTC have breached their contractual obligations, express warranties and its implied warranties.

D. Grant the partnership Rescission and its other claims for relief set forth in Count One of this Amended Complaint .

E. Declare the sale and agreement null and void.

F. Grant the Partnership all of its damages and expenses, including compensatory and exemplary or punitive damages.

G. Construe the law and matters in question and determine the rights and obligations of the parties under these circumstances.

H. Make such further orders as are appropriate in the circumstances, to the end that all parties have clear notice and understanding of the decision and directives of this court.

I. Pursuant to 28 U.S.C.§ 2202, grant the Partnership such further relief as may be fitting, just and appropriate in the circumstances, including but not limited to an award of reasonable attorney fees and costs.

J. Grant the Partnership a trial, by jury, on all issues and matters so triable.

CHARLES PLACE ASSOCIATES
By Its Attorney,

John B. Reilly, Esq. (#1811)
JOHN REILLY & ASSOCIATES
100 North Main Street, 4th Floor
Providence, R.I. 02903
(401) 272-2800
(Fax) 272-2811

VERIFICATION

The undersigned, being duly sworn upon oath, hereby depose and say that:

1. I am the General Partner and duly authorized representative of the plaintiff in this action.

2. I hereby verify that the facts and matters contained in the foregoing complaint are, to the best of my personal knowledge and belief, true and accurate.

3. With respect to those matters that are asserted to be "upon information and belief", I further, to the best of my knowledge, believe them to be as stated.

H. Charles Tapalian, General Partner

Subscribed and sworn before me at Providence RI, this 12th day of February, 2008.

Notary Public